Good morning, Your Honors. Levy Lesch is present for the appellants Blyklitz and Davidecay. Can Your Honors hear me well? Yes. Thank you, Your Honors. Thank you very much for accommodating us today with all the difficulties. I'd like to start today's argument by suggesting that the District Court accepted the appellee's conflation of two similar but distinct issues. The first issue, which was argued persuasively by the appellees in the District Court, is the, I would say, the tension that exists between Monsanto and Ligon. In the sense that when you have a vertical price fixing scheme, I don't want to use the word conspiracy, but when you have a retail price maintenance being imposed in a vertical hierarchy with the top of the chain imposing prices down the chain, that automatically opens the question as to whether the party imposing the prices is proceeding via a scheme of enforcing compliance with a preexisting pricing scheme that's been preannounced, or whether there is a flexibility in the pricing and the retail price maintenance is a case-by-case ad hoc determination that ultimately is nothing less than a conspiracy in the restraint of trade. So that's one aspect of what we're dealing with here, which is we're looking at a vertical price fixing scheme, which involves retail price maintenance, and we have a higher-ranking actor within that chain, which obviously has greater market power, forcing and coercing consent by a lower-ranking actor. Separate and apart from that issue, there is the issue of whether a majority equity interest by one company in another company that is untethered from managerial interest. And just to put it very specific, as the facts are within this case, that it's acknowledged and in the pleading that the Zelle Appellees have a majority stake in the equity of the non-party ASTG with which the price was controlled. And whether that equity interest refers to how equity is split in the event of a liquidation event, or whether that refers to a distribution of assets after debt has been paid off or preferred interests have been paid off, that remains unknown at the present stage. The only thing that's really salient at the present stage is that it's clearly alleged in paragraph 151 of the dismissed Second Amended Complaint that the parties affirmatively contracted to maintain managerial autonomy between All-Star Travel Group and the Zelle Appellees. And as was extensively put in the briefs, the fact that the parties contracted to maintain All-Star Travel Group's ability to control its own pricing and to control how it did business, the fact that there was a contractual agreement to preserve that level of managerial autonomy is something that this court should respect. And the idea that there is economic unity under circumstance… Counsel? Counsel? Forgive me, without video, it's kind of hard to get in a word. Do you mind if I jump in here? I'd like to ask a question about this, because I think it is uncontested that there had been a sale of a 51 percent, a majority stake, right? Non-controlling. An equity stake, but not a managerial stake. Yes, Your Honor. So the answer to my question is yes, right? It's uncontested that a 51 percent stake had been sold, right? Correct, Your Honor. Okay. And so I just want to push back, and this is really for opposing counsel as well as for you. If that's all there were in the complaint, I think you'd have a problem. I think then you might have a bare allegation. And after all, it's not like our earlier case where we talk about whether there's a significant interest or a substantial interest. 51 percent is a majority interest, and I think that is uncontested. But I am more interested to hear what you have to say, and opposing counsel, about paragraphs 84, 88, and 93, in particular 93. 93 says that Tizell, and I don't know if I'm pronouncing that correctly, by the way, and ASTG had two employees in direct competition with each other. Jim Garcia was Tizell's then director of IC recruitment, and Susan Duffy was ASTG's director of IC recruitment. Apparently, they were literally tasked with competing against each other. And the other paragraphs refer to instances where clients were indeed, I'm going to use the word poached. That sounds pejorative, and I don't mean it to, but allegations where there had been instances where there had been competition. It seems to me that that's a whole lot more important. Thank you, Your Honor. If I could direct Your Honor's attention to page 44 and 45 in the appellant's opening brief, where we quoted directly from American Needle the statement that, in rare cases, the presumption, presumption referring to economic unity, does not hold. Agreements made within a firm, and that's the interesting language used by the Supreme Court, agreements made within a firm can constitute concerted action covered by Section 1, when the parties to the agreement act on interests separate from those of the firm itself. And I think Your Honor is entirely correct that, in this instance, there are clear allegations that the entities at hand engaged in direct competition really on the very market, which was the subject of the price fixing conspiracy. Because, as alleged in the Second Amendment complaint, the subject market, which the prices were fixed within, was within the market for getting contracts with independent contractors selling airfare. So, again, the market isn't actually the consumer sales of the airfares to the consumers. The market is when the upscale... I think what matters is that, into a firm, they're competing. And that's why I called your attention to 84, 88, and 93. It's not just the bear allegation. Because I think if you're going the bear allegation of the majority sale, that despite the majority sale, that management had been retained based on what Mr. Odaka had to say, that strikes me as much more wobbly. And I appreciate your argument on American Needle. Your brief focuses on American Needle extensively. I don't think the district court cited American Needle. Is that right? That is correct, Your Honor. The American Needle was an issue raised extensively and argued in the opposition to the motion to dismiss the First Amendment complaint. But it hadn't been addressed in the opposition to the motion to dismiss the Second Amendment complaint. Why is that? Based on my understanding of the operation of the local rule 718, which the issues that remain to be decided on the Second Amendment complaint have to be issues outside those that have been already decided against the flight plates parties in the First Amendment complaint. I have limited the scope of issues to those issues which the court had not really ruled on. So just the chronology is that the court dismissed it. I remember. Counsel, thank you. You've answered my question. I don't want to take more of your time because I remember now you did explain that in your briefing. Thank you. Yes, thank you, Your Honor. And if I could just make one more point regarding Paragraph 151. I appreciate Your Honor's observation that the fact of actual competition may seem more persuasive than Mr. Odaka's belief that he had complete control over the management of the company. But I would respectfully disagree with that assertion because, as noted in one of the footnotes in the briefing, possession is nine-tenths of the law, and that's the reality. I thought you might just take yes for an answer. Okay. Nothing. I appreciate your response. Thank you. Thank you, Your Honor. With that, I will reserve the remainder of my time. Okay. Thank you, Counsel. Unless any of the other judges have further questions. Thank you, Counsel. Ms. Gunter? Good morning, and may it please the Court. My name is Denise Gunter, and I'm here on behalf of the defendants' appellees, and I'll refer to them collectively as Zell. That's what I should be saying? Like there's no T? That's right, Your Honor. Thank you for your very diplomatic correction of my pronunciation. I apologize. The central issue in this case is whether there were two separate actors who were legally capable of conspiring. My clients, the Zell defendants on the one hand, and then this non-party ASTG. And the answer, as correctly decided in front of the district court, was that no, we did not have two separate actors legally capable of conspiring. Why not? The reason is, Your Honor, is because of the majority equity interest that my clients possessed at the time of these alleged conspiratorial actions, as alleged in paragraph 151 of the complaint. If I may, I'd like to address specifically the paragraphs that you had called to counsel's attention, and I believe those were 84, 88, and 93, which talk about competition or alleged competition within the Zell and ASTG grouping. And I would respectfully submit that that competition that is alleged, in other words, there were two employees who were tasked with competing with each other, and there was also some allegation about secret meetings and how people were excluded from various meetings. Those allegations do not trump the unity, the economic unity that had been obtained when my client purchased the majority equity stake. Well, why not? Isn't it a more subtle analysis, you know, pursuant to American Needle? Your Honor, I think this court, this circuit's opinions in Freeman and Jack Russell and then Randall, which is the latest pronouncement on that, are all perfectly in line with American Needle. And American Needle, I think it's important to look at what the... American Needle is a Supreme Court case, and it seems to more closely apply to the facts of this case in instructing us not to make the overlapping ownership be the dispositive issue. You have to look at the entirety of the relationship. No, you look at it functionally. Exactly, Your Honor. That's what the case law, starting with Copperweld all the way through American Needle and then this court's decisions, all instruct us to look at the functional relationship between the parties. We must also look at the entirety of the complaint when we're considering a motion to dismiss. Right. So, Counselor, it seems to me that would you acknowledge that having a majority equity stake does not necessarily mean that they have a majority controlling or managerial decision-making power? Your Honor, in paragraph 151, what we have is a mix of facts alleged and legal conclusions. My question, though, is just basics. As a matter of law, is it possible for a majority stakeholder, equity stakeholder, to not actually have managerial control? I suppose it's possible, Your Honor, but I think it would be highly unusual. And what is pled in this complaint, particularly looking at paragraph 151, is the ODACA legal conclusion repeating, in essence, what his lawyers allegedly told him, that they drafted these contracts, which, by the way, are not in the record, in such a way as to vest him with continued control even though he had sold the majority of the business to my clients. So I would respectfully submit that those allegations in 151 that are the legal conclusions are not entitled to the truthfulness as we would with the factual allegations. Counsel, that is a troubling argument because we are at the motion to dismiss case, and there's no reason why the contracts would have been put in necessarily at this stage of proceedings. And at this stage, we have to take the facts in the light most favorable to the plaintiff. And it is a fact that that was his understanding, that he had full management control. Correct? That was his representation to the other party, to the conversation, Mr. Kaye, Mr. ODACA had been told by my clients, no, you do not have the authority to cut this deal with Flightblitz, as you represented. So he walked it back. He said, you know, I'm very sorry that this happened, but this was, I still have the control in this company. You're correct. He didn't have to attach the contracts to it, but he's now making a representation, a legal conclusion about this alleged control that he had. But even the allegation, going back to Judge Woodlaw's question, I can imagine a circumstance where someone in Mr. ODACA's position, not Mr. ODACA, just a hypothetical person in that position who may have said this in a boastful way or in any manner of circumstance, we just don't have this fleshed out. He's represented that he had the ability, that he had clever lawyers who could retain control for him, even though he had sold a 51% stake, does apparently a handshake deal and then comes back. And he's, as you just acknowledged, he continues to represent, well, I could do it, but I'm afraid I'm going to be blacklisted, so I'm not going to do it. So given that kind of murkiness, it seems even if we looked at 151, it doesn't get us there. I think if you continue reading the complaint, though, Your Honor, what you see is a course of conduct on the part of Mr. ODACA, which clearly acknowledged that he had some duties and some responsibilities back to Zell because what they told him, this deal, you've been conned, is what is alleged in the complaint. So he goes back, and then he spends, over a course of several days, according to the allegations in the complaint, spends multiple days trying to get consent from Zell for a recut deal, which they eventually did. He said he had to make upwards of five phone calls. Counsel, my problem for you is that I have tried to read the entire complaint, and so these other paragraphs, you know, I've just grabbed out a handful of them, but there are considerably others that flesh out that there was this actual competition going on. What about that? So with respect to the actual competition, Your Honor, I would go back to what the law is telling us to do. We look at the entirety of the relationship. We can't minimize, of course, this important majority equity stake that is specifically alleged, and then looking at the other things that are going on with this repeated effort to try to get consent from my clients and then telling him you've got to redo this, we don't accept it, and so on. The rivalry, the internal rivalry that is mentioned does not beat the allegation of ownership, of majority ownership. But we've gone back now into the problem that the majority equity stake is not dispositive under American Needle and that that's a form issue and we have to look at function. If we're looking at function, we have many specific allegations of actual competition and at least some allegations that, you know, that Odaka retained independent managerial control, which would seem to satisfy the functional analysis of two separate decision makers. I understand that there could be a factual dispute about whether he actually retained majority managerial control, but we're on a motion to dismiss and drawing all inferences, because accepting all the factual allegations is true and drawing all the inferences in favor of the plaintiffs. I don't see how we can construe all those factual allegations as making it under American Needle clear that there was no separate entity here. And if I may address specifically American Needle, Your Honor, American Needle involved a situation where you had the 32 teams of the NFL owning a company that licensed intellectual property. But as the court's decision makes very clear in American Needle, all of these businesses, the football teams, were all separately owned businesses. There was no common control at all amongst the 32 NFL teams. It is true that they controlled this NFLP, which was the licensing arm, but they did not control each other. And the actual action that went on in American Needle that was found objectionable was this exclusive license of each team's intellectual property, their individual assets, which is not the case that we have here because, again, without overemphasizing paragraph 151, that's what we have is that majority stake in the business, which makes this case fundamentally different, I believe, from American Needle. Counsel cited to the court some of the distributor cases, Monsanto and Ligon, also very different because those are situations where the manufacturer and the distributor, no one owns each other. They are two entirely separate entities, so they're quite different. So I think if I go back, I think the Freeman case, which is this court's decision, I think it's 100% consistent with American Needle because what it has is a construct where you have economic unity, which, again, was absent, really, in American Needle because those teams were all separately owned. So if you follow the reasoning in Freeman, which, again, our position is it's consistent, you wind up with no two separate actors legally capable of each one. But you think if we remand for the district court to consider American Needle, you think she's going to get to the same place. It is a little cattywampus because the court didn't address American Needle because it wasn't in the opposition because opposing counsel thought he'd already lost on that. So it comes to us in a little bit of a funny posture. Yes, Your Honor. If I may, I see I am out of time, but if I may address your question. I'm not sure I really asked one. She didn't ask a question, but I think. I have a question. Do you have a case that says a majority equity stake in and of itself is enough to show complete unity of ownership and functional control for the purposes of this analysis? Yes, Your Honor, we do. And those are cited, several of them are cited on page 16 of our brief. That says where it's just a majority equity stake? I don't know that they use the word equity, but they talk about majority ownership. Majority ownership. And what if there is a genuine factual dispute about whether the equity stake translated into managerial control? Do you still win on the motion to dismiss? Yes, I believe we do, Your Honor. Okay, and what's your best case for that? That even if ODACA retained managerial control, there's still unity. So my best case is, Your Honor, I would go back to Freeman, Jack Russell, Randall of this court, and, again, I think those cases are 100% consistent with American Needle. Okay, thank you, counsel. You've exceeded your time. Mr. Lesch, do you have a minute? Do you want a minute for rebuttal? Thank you, Your Honor. If I could just quickly run through some quick rebuttal points. With respect to the distinction between managerial control rights and equity rights, I have personally dealt with cases, you know, involving majority equity interests that have zero managerial rights. They're fundamentally different, particularly in LLC. And the idea that any pleading stage inference can be drawn against the pleader regarding the control versus equity within an unspecified LLC I don't think is appropriate. With respect to the paragraph cited by opposing counsel, I would also like to point out to the panel's attention Paragraph 182, which specifically references that within the Zell hierarchy, there was actually a green lighting of active competition. I also do not agree with the distinction drawn by counsel regarding to distinguish American Needle, because that language, which I quoted from American Needle, referenced that you can have active competition within a single firm. And as my final point, I would like to point out that even if somehow opposing counsel could show that perhaps prior authority of the circuit would go against the flightless parties under the Sherman Act, I don't think that would hold true to the Cartwright Act. I think under the Cartwright Act, California would follow American Needle. And for that reason, reversal is appropriate. Thank you very much for your time today. Thank you, counsel. Flight Blitz versus Zell Travel is submitted.
judges: WARDLAW, CHRISTEN, SUNG